We're now going to move to the second case of the day. J.K.J. v. Polk County Case numbers 18-1498 18-1499 18-2170 and 18-2177 We're going to begin with Mr. Cranley. Please, the Court. Good morning, Your Honor. Good morning. Polk County asks that this Court reverse the jury verdict in favor of the plaintiffs because the plaintiffs failed to prove or present evidence showing that the county was deliberately indifferent or that any policy or custom of the county caused the plaintiffs' injuries. In evaluating that issue, four facts are important to keep in mind. First, at the time Darrell Christensen, the officer at issue here, sexually assaulted the plaintiffs in the Polk County Jail, the county maintained policies and trained its employees that sexual contact with inmates of any kind was forbidden by the county policy and was against Wisconsin law. All officers, including Mr. Christensen, also received training through the State of Wisconsin in certification and recertification on those same issues. Second, it is undisputed that throughout the time Mr. Christensen committed his acts, he knew his actions were contrary to county policy, contrary to the training he'd received from the State and the county, and were a crime and a felony under Wisconsin law for which he would be prosecuted and would lose his job. Third, it's undisputed that Polk County had no knowledge of Christensen's activities until they were reported in 2014 by another inmate, at which time he was immediately arrested, prosecuted, and sent to prison. And finally, there's no dispute... What was the sentence? Pardon me? What was the sentence? Thirty years, Your Honor. Thank you. And finally, there is no dispute that prior to Christensen's offenses, there had never been another sexual assault in the Polk County Jail. Mr. Cranley, can I ask you a question about the factual record? What's the most specific evidence in the record regarding the regularity, content, and participants in the so-called tier talk? What's the most specific evidence you can think of in the record? There was some testimony that Captain Nargis once heard Mr. Christensen make a comment about a co-worker's or some other female's rear end, and there was testimony that Mr. Nargis was once told that Christensen had made a comment about an inmate's breast, not specific as to when in the 10 years or so that he worked there. And the rest of it is very nonspecific. In fact, the definition of tier talk is not necessarily flattering commentary or sexual commentary among, actually the word sexual isn't even in there, among co-workers, so no relationship to inmates necessarily. But the important point about the tier talk is there's no evidence that the policymakers at the county were aware of it, except for this claim that Captain Nargis, who we believe was not actually, should not have been found to be a policymaker, was aware and participated in some of it. But how often did it happen? I thought Captain Nargis admitted that, quote, on occasion, unquote, he participated in it. That's correct. The other point about that, Your Honor, is what the plaintiffs are trying to suggest is that there was this atmosphere of sexual innuendo throughout the jail that suggested perhaps that jailors like Christensen might be inclined to think that their actions would be tolerated if they went out and sexually assaulted someone. Well, there's two reasons why that should be rejected. First of all, the facts prove that that's not true. Christensen was under no illusions that he was going to get away with this. In fact, he told the plaintiffs, and the plaintiffs admitted, that they shouldn't tell anybody because if they told someone, he would be in trouble, he would lose his job, he would lose his family. He understood that this wasn't going to get swept under the rug, regardless of whether he was allowed, even if he was allowed, to make comments of that sort. Secondly, this court, the Seventh Circuit, has reviewed cases under similar facts. The Johnson v. Cook County case, in which the plaintiff was sexually assaulted and claimed that the county looked the other way when there were claims of improper supervision and so on. And that that created an atmosphere that put inmates at unreasonable risk of harm. And the implication was that because the county was suppressing these complaints, that officers would feel like they could get away with this. And the court said, we're not going to accept that, that there's no sufficient causal link between that alleged policy and the actual sexual assault. It's also important to remember that we're in the world of a very narrow exception to a general rule that was established in Canton. Deliberate indifference that the plaintiffs have to prove in this case requires proving notice on the part of county policymakers. And the U.S. Supreme Court and the Seventh Circuit have long held that proof of notice ordinarily requires evidence of a pattern of similar unconstitutional activity or violations. But in this case, the plaintiffs have conceded, and the district court concluded that there was no such pattern, notwithstanding the jorgans and stuff that I'm happy to talk about later. Therefore, the plaintiffs were required to fit this case into the rare exception that the Supreme Court has held applies only in a narrow range of circumstances, and that's the city of Canton exception, which provides in the absence of a pattern of prior similar violations, notice can be shown by proving that the county's policies and training were so deficient, and the risk that those deficiencies would lead to  to the need for more or better policies. And in coming up with that exception, the city of Canton wasn't proposing a lower standard. What it was saying is that, in the example that it gave, if you send out your police officers with guns, and you know that they're going to be in situations where they're going to be confronted with a choice of whether they should use that gun or not, and how to handle themselves, and you provide them no training whatsoever, you're essentially as culpable as if there had already been those same violations having occurred, a pattern of them, because you know it's going to happen. In other words, it's not some lower standard of culpability here. The policies or the deficiencies in the policies the plaintiffs have identified have to have made it so obvious that individuals would be sexually assaulted, and there's the obligation of the plaintiffs to prove causation. That is a direct causal link between the deficient policy and the sexual assault that occurred in this case. And here they can't do that under any of the kinds of... Do we have to ask the question at that level of specificity? In other words, the exact harm and conduct that Christensen engaged in in this case, or can we ask it at a slightly higher level of generality? That the alleged deficiencies with the policies and the training would have led to some assaults of female inmates by male guards. In other words, you're casting the question at a very high level of particularity with respect to pretty egregious conduct by Christensen. Is that the right way to frame the causation question? I think so, because the court has been very... What authority supports that? Well, the courts have made very clear that the causation standard in a Section 1983 claim, in a Monell claim against the county, is very strictly enforced, and particularly in a case like this where you have a constitutional situation. There isn't an unconstitutional policy here. So in the situations of training, supervision, deficiencies in hiring, the court has said that the causation element has to be applied with special rigor. Now, if we're not talking about sexual assault and we're talking about other kinds of policy that might lead to other sorts of improper behavior, I think that's far too general. No, we're definitely talking about sexual assault, but do you have to ask the causation question at the level of were the alleged deficiencies here ones that caused the, what, three-plus years of conduct that Christensen engaged in? Well, the fact that there were three-plus years is really somewhat irrelevant because the plaintiff has to prove knowledge and notice on the part of the policymakers, and they had no notice of that. So really what we're talking about is one incident. This is a single-incident liability case that has been referred to by the Seventh Circuit in those terms. In other words, the fact that it occurred many times by Christensen is irrelevant. The fact is they had no notice of any prior sexual assaults in the jail, and they had no prior knowledge of Christensen's assaults. And this court has never allowed any case of single-incident liability in a sexual assault case. In fact, the Seventh Circuit has only recognized two cases and allowed them to proceed on a single-incident theory, and that's the Woodward case in 2004 and the Gilson case in 2017. Those are the only two. Both are very distinguishable, and neither of them involve sexual assault or misconduct. What the plaintiffs are attempting to show here is, like I said, that there's this atmosphere that permitted sexual assault and that the policies led to that sort of thing. Mr. Cranley, on that issue of the sexualized culture, there's these four different pieces of evidence that they're pointing towards. One of them is the allegation of no training with regard to sexual assault. What's the county's position on that? Well, the county provided all kinds of training. There was training at the state level, of course, to become certified and then recertified. The county provided its own in-house training, both in the form of field training by officers who had been certified by the county to provide training. They provide daily training with respect to important policies and other information, and they provided other non-mandatory training throughout the year, including even this PREA training that's been discussed. But remember that sexual assault is a little bit different. It's been treated differently by courts. These officers are expected to know the law. Not only that, they've been trained that the law makes it illegal to have any improper sexual contact with inmates. And courts around the country have held, and this language from the Flores case in the Ninth Circuit is indicative, that if the threat of prison time is insufficient to deter sexual assault, it is not plausible to assume that specific instruction will provide such deterrence. Telling Christiansen in some other way that sexual assault is bad has no impact here. He already knew everything he needed to know. Secondly, courts, including the Seventh Circuit in the Tapia case and the Palmquist case, have held that as long as the officer has gone through state-mandated and required training to become certified, that alone is sufficient. More particularized or specialized training is not necessary. And that's especially true given what I just said about sexual assault. But in the Palmquist case, the court rejected the very theory the plaintiffs have here, more specialized training related to PREA or what have you. And in that case, the officers were confronted with a basically psychotic person. And after trying to subdue him, they ended up shooting him and killing him. And the estate claimed that the county, while they provided basic training for recruits, should have provided more specialized training in how to deal with abnormally behaving individuals. And the court said the estate's argument boils down to no special training equals deficient training, and we cannot accept this equation, finding that the general recruit training was sufficient. You also have to look at what the specific claims are that the plaintiffs have made with respect to what they should have done. They said that they should have provided posters on the wall. They should have shown a video to incoming inmates. They make vague allegations that the county should have provided training on prevention and detection of sexual assault, but they provide no specifics about what that is. They didn't propose any new policy or tell us what language was missing or should have been added to the county's policy. The only thing that their expert ever said with regard to that was that the county should give training to officers to look for signs of abnormal behavior by inmates that might suggest that perhaps they've got something going on. Well, the county did that. They had a policy that required officers to observe and record what was going on with inmates and specifically to look for changes in hygiene, et cetera. What they're proposing is not only specialized type training. What they're talking about is simply they wish that the county would have done it better, that there are ways they could have done it better, there are other policies, other training they could have had that the plaintiff's expert would have liked more. In other words, they think their practices could have been better, and the courts have consistently rejected the best practices theory and said that a county is not required to have the best practices available provided that they give some training. There's no dispute there was training and there were policies provided in this case. Plaintiffs just think they should have done more. The other thing that they've talked about that I want to address is this issue of the lockbox for complaints. The plaintiffs in their brief in response essentially concede that none of the changes that they propose, posters or videos or whatever, would have stopped Christensen from doing what he did because he knew it was wrong and he did it anyway. So what they've suggested is that maybe some of this could have been prevented if you had given inmates an ability to make their complaint through a lockbox rather than through the normal grievance procedure. Can you go back to one of the points you made earlier? Sure. What's the best authority you can point us to that the proper way to think about this is as a single incident given the longevity of the Christensen conduct? Because the question is... I don't know where you get that from. Because the question is notice. There was no notice of any other similar violation. And that's the question. The question isn't how many times it occurred or over what period of time it occurred. The question is notice. Because the issue for the county's liability is whether it maintained a policy and a custom of permitting this sort of behavior. And if they didn't know about it, they can't be found without a policy or custom permitting it. Well, but you have... I know you don't agree with this, but you have on the other side of that, you have tier talk that's occurring throughout the period. And you have at least one incident, to be sure, very different factually, that Jorgensen engaged in or allegedly engaged in that occur throughout the period. And so if that evidence is relevant because it's occurring across the period, I don't know why it's fair to call it a single incident. Because, again, the issue is notice. But that goes back to the point that I made before, that what we're talking about here is that exception to the normal rule of a pattern where you need to show that it was obvious that this sort of thing was going to occur. It's not supposed to be some step down in culpability. And so this is the very reason the Jorgensen evidence shouldn't have come into evidence. Because essentially the court said, on the one hand, this isn't a prior similar incident sufficient to show a pattern of prior constitutional violations, but we're going to let it in anyway as proof of notice. Which essentially says to the jury and to the plaintiff, they can decide that the risk was obvious based on what has been found as a matter of law to not have been a prior similar... But notice doesn't have to be formal notice under the law. Nobody has to knock on Captain Nargus' door and say, hey, let us tell you what's going on. That's exactly right. They have to prove that this Tear Talk and this Jorgensen issue that policymakers had no notice of until it was reported to them, provided notice, in other words, made it obvious that sexual assaults were going to occur. And courts have rejected that under similar facts, as I pointed out before. You're into your rebuttal time. Would you like to reserve? I would. Thank you. Very good. Thank you. We'll next hear from Mr. Widener. Respectfully, Your Honor, Ms. Mills. Ms. Mills. All right. Ms. Mills, we'll have you come forward. Thank you. Good morning, Your Honors. May it please the Court. My name is Sarah Mills, and I represent Defendant Appellant Daryl Christensen in this matter. And I would like to address this morning the trial court's unilateral decision to alter the Seventh Circuit pattern jury instruction by removing an entire element necessary to prove deliberate indifference against Mr. Christensen. This revision of the pattern instruction was highly prejudicial. It infected the jury's finding of liability. It shifted the burden to the defendants in the damages phase to essentially disprove harm. And it infected the amounts awarded as damages. Because of the way the jury was instructed, Mr. Christensen was found liable for violating the plaintiff's constitutional rights without any finding or consideration on causation. And the trial court actually did not just fail to instruct jurors on the element of causation. It actually instructed and warned jurors that they were not to consider cause and that causation was not material to the questions they were being asked. Ms. Mills, I've got the instruction before me. It's Record 243. There is a one-sentence reference to causation on page 5. And that is referencing the paragraph above it with regard to the use of that term. Rather than a wholesale excision of the concept, you believe the definition was insufficiently robust or inaccurate? Correct. To reference causation in passing is not to give causation the importance that it needs to be as an essential element of the claim. It is just as important as establishing that Mr. Christensen knew of a substantial risk of harm. It's just as important as establishing that Mr. Christensen then deliberately and consciously disregarded that risk of harm. It cannot be relegated to an explanatory phrase because the jurors need to understand that it itself is equally important. It is not secondary in nature to any other element of the claim. And I think the effects of that sort of relegation in passing comments are seen all throughout the rest of the trial. When the trial court, despite that reference in the actual language given to jurors, discussed this instruction, it told jurors verbatim, you are not to concern yourselves with causation. What had happened was the trial court began reading the instructions and must have mistakenly had an earlier version that did include that element as a specifically numerated element and realized after it was read that the decision had been made to remove the element and then the trial court had to correct itself and say, actually, no, you are not to consider causation. It is not material to what you're being asked to decide. So the jurors ultimately were instructed in such a way that they didn't understand that they needed to consider the plaintiffs as distinct individuals who had different experiences, different reactions. They ultimately found liability without ever finding causation, but then they also awarded compensation that was based on this misunderstanding of a link of causation. Their awards were based on a finding that Christensen only knew of a risk of harm to the plaintiffs and that he disregarded it. It was not a reflection of harms actually suffered by each individual plaintiff caused by Christensen. And this was prejudicial to us because we, coming into trial, believed that the jurors would be correctly instructed on the law and the jurors would understand that plaintiffs needed to prove this element to establish liability. And that belief was reasonable because of the pattern instructions inclusion of it and also because the trial court had initially included that in its instructions and early on when plaintiffs tried to modify the language of that instruction, to add language that would essentially read in such a way that it was assumed that sexual contact harmed the plaintiffs, the trial court rejected their request and explicitly stated that causation remains under current law a question for the jury. So ultimately, based on the pattern instruction that we had submitted and that the trial court had agreed to and the trial court's comments, during trial we elicited testimony that went to causation on things like consent. We asked the plaintiffs questions about whether they said no, whether they indicated to Mr. Christensen that the contact was unwanted because this goes to consent and whether the contact caused harm. After the parties rested though and before the case was given to the jury, there was another instructions conference and the trial court at that point decided to move the element to the damages phase over our objections. So not only did this improperly state the law, but it allowed us in the jury's mind to look as if we had just spent three days questioning the plaintiffs about concepts that were wholly irrelevant and in fact the judge did tell the jury causation is not something you need to think about. So it follows that once the jury had a finding of liability, it was already flawed in the sense that they had never been asked to find causation, it also infected the damages phase by setting up a situation where jurors assumed that harm had occurred and case law states that you have to actually prove causation before you can get to the damages phase. At that point, the burden essentially shifted to defendants to disprove the element of causation. In other words, show me how you didn't cause harm. And the burden is on plaintiffs to establish the elements of their claim. And cause in particular is very individualized, very fact specific. It's a nuanced inquiry. And this wasn't an evidentiary question where we took a gamble on it and thought it could be eliminated at some point in an instructions conference or before the case was submitted to the jury if it was warranted by the evidence. Instead, it was a fundamental element that the plaintiffs were required to prove. So coming into the trial, we assumed that the jury would be properly instructed and our examination only led to this prejudice which, as I noted, ultimately infected jury awards that don't actually have a connection, a causal relationship between the testimony of the plaintiffs and their experiences, their experts' testimony, and the amounts awarded being identical. Why doesn't the language in the damages instruction cure some of what you're arguing? This goes again to prejudice. It creates in the jury's mind this misconception that harm is assumed, that it is automatic, that sexual contact is per se harmful, and it is going to cause harm. And it shifts to the defense the burden to have to disprove that there is any causal connection, to disprove that harm actually occurred. And it also infects the jury, generally speaking, in this case, not only the removal of the element from the liability instructions, but combined with the judge's statement to jurors that it's not relevant and then also coupled with the fact that the instruction as to the claim against the county did include a causation element. All of this together, looking forward, we have no way to know how they were able to adequately, correctly parse out all of the evidence that they were hearing once we got to the damages phase, because they were already operating under this assumption that causation did not matter and they should not consider it. And so at that point, I think we really had no way to cure the issue other than to essentially try to disprove a negative, something we don't have the burden to prove anyway. It also allowed, unfortunately, in closing arguments, opposing counsel to point out that we had questioned the plaintiffs on these questions that the jury was told were not relevant and made us look as if we were blaming the victims, trying to point the finger at them and say they somehow welcomed this or somehow created a situation where we didn't have any fault, just regardless of the fact of causation. So in that sense, it was extremely prejudicial as well. And ultimately, as I said, once the jury had found liability, they were operating under this mistaken assumption that any kind of sexual contact, regardless of the context or circumstances, is automatically harmful. And then the burden shifts to the defense to disprove causation and harm. And if there are no further questions, we ask that the court reverse the trial court's decision and particularly grant Mr. Christensen a new trial. Thank you, Ms. Mills. Now, Mr. Weiner, the floor is yours. May it please the Court, I'm Tom Weiner. I represent the plaintiffs, J.K.J. and M.J.J. I'm going to take this a little out of order based upon what we've just heard. I want to complete the statement on the record that Judge Connolly made as far as its relation to causation in the liability phase. As stated by counsel, Judge Connolly read through the instructions, and he did in fact say, tell the jury, you are not to concern yourself with causation as stated by counsel. That's not the complete sentence. The complete sentence includes the words, at this time. That's the proper statement. What Judge Connolly did is he removed liability or he removed the causation element from liability to damages. It was objected to by counsel. He understood that. We made a record of it. It was a clean record. What ended up happening is Ms. Mills made the objection, and I'll reference you to document 264, page 123. I'll indicate that on our transcript it starts on line 7. That was her first objection. Judge Connolly at that time made an exception. He believed he could make this finding as a matter of law, that no reasonable jury could find that these women were not harmed in any fashion, in any fashion. The lowest scintilla of harm is all that needed to be provided. These two individuals had been sexually assaulted up to 70 times per person over a three-year period, and he said no reasonable jury could make that finding. But he didn't make the finding as a matter of law because he didn't want that to be appealed. What he did say is that I believe the harm element is more appropriately suited in the damages phase. He made it perfectly clear that the jury would be considering the harm element causation in the damages phase. In fact, he says on page 129 of document 264 in the transcript, I do not think a reasonable jury could find that. But to preserve this for appeal, I am going to allow the defendants to make the argument as part of the damages phase with the understanding if they were to prevail on no harm, it might well direct the verdict as liability, but the defendants could make argument to the Seventh Circuit, and I could be wrong. What he ended up doing was he moved it to the damages phase, and everything he did, he indicated, was with the intent for the jury to hear the instruction as a whole. A judge has great discretion when giving jury instructions. So what he ended up doing, he gave the actual law. He told Ms. Mills had no objection to the law. In fact, as presented, she agreed with the fact that consent was part of the harm instruction. She agreed with that, and I believe that's in document 259, pages 8 through 10. She agreed with the instruction as written. She objected to the placement in the harm phase or damages phase. It was always Judge Connolly's decision that the jury would make this decision. He made such a statement in document 259 on page 72 when he said the jury found all the elements of liability except harm. He did so again in document 255, page 7, when he said the jury will first need to decide whether there is harm and then damages. He did so again before this was submitted to the jury at the end of all of the testimony and evidence in 255.12. I'm going to allow defendants to make arguments as part of the damages phase. The key here is the defendants both waived the causation instruction to the jury. Waived it. That was the finding by Judge Connolly. If you call the attention to the transcript on document 265, page 10, lines 29 and 21, when the court asks directly to both counsel prior to the damages arguments in this case, the court says, and that brings me to my second concern, and that is I just want to confirm, is the county going to actually argue that there was no harm here by Mr. Christensen's conduct? Mr. Cranley, on behalf of Polk County, responded, I don't think so, no. The court inquires with Ms. Mills and says, is that really something you want to argue to this jury at this stage? Ms. Mills' response on behalf of Mr. Christensen said, no, Your Honor. The court then advises counsel, all right, so I'm not going to give the harm instruction. It just seems pointless, and I appreciate defense counsel's candor. By virtue of their verdict, it's clear they found harm, even though that was not expressly asked at the constitutional claim against Mr. Christensen, which brings me to the two instructions. That is clear waiver. They acquiesced. They affirmed its removal, and that's waiver, and that's what Judge Connolly found, which brings me to my second point about waiver. Judge Connolly's finding in the post-trial motions was waiver, clear waiver. That's all he responded with, that you waived it, clearly referencing the record. This was never briefed in their initial brief, the element of waiver, on whether or not they waived it. It's only in their reply brief were we in a position to have to answer to that. So I don't know if the court actually has to get to the jury instruction based upon the procedural flaws in their argument of not addressing the issues of waiver found by Judge Connolly and not addressing them before this court in their original pleadings. Now that took me way outside of where I was going to start, but let me at this point ask this court, as you're fully aware, that we're here today to ask that you affirm the verdict in favor of J.K.J. and M.J.J., that the jury heard all of the factual arguments and they were all weighed by that jury, and those elements were dismissed. I'm going back to the theory here of what is the controlling law in this circuit, and I point to two cases, Woodward and Gleason. And the reason I point to those two cases is because those are the two cases that this court found fit the exception, and that narrow exception under Canton, and rightfully so narrow exception. But this case is another example of that. This is a training case and a policy case, and I'll take those in order. And I respectfully edit what I said earlier. It's the en banc decision in Gleason and not the original Gleason. In a training case, as you identified in Woodward, that it was necessary to show that there was an obvious risk. The facts presented in this case, sexual assault is an obvious risk. Counsel misinterprets the causation statements in Woodward and Gleason by saying we had to individually particularize that Mr. Christensen was the risk. We don't have to do that. It's a more generalized risk than that. The risk of sexual assault in prisons is an obvious risk. If you go back, there's congressional legislation on this. The PREA Act indicates that up to 13% of all inmates are sexually assaulted in prison. This is a known risk. If we want to keep with that, we look and say, what's the testimony in this case? Captain Nargis, the jail administrator who makes the training and policies for Polk County, says it is a high-risk, low-frequency situation that is the type of risk you must train for. That's the one you must train for. The likelihood here to a high-risk situation is, in Woodward, it was suicide prevention. In the Woodward case, that was a high-risk situation, an obvious risk. Captain Nargis himself, in his testimony, likens this to suicide prevention, which requires policies and training. Let's go to the training element of this. The question before this court, with the finding in Woodward, says that this court asks, was there adequate training to address the likely harm? We've heard testimony today that there was adequate training. There was training. They trained on everything. They trained on everything except sexual assault. Our expert witness talked about the industry standard, which is known as PREA, Prison Rape Elimination Act, which is all over this transcript, because that's the national standard. That's the industry standard. In fact, at one point in a reference by Mr. Atherton, their own expert, he says that's what people were training on as an industry standard. He doesn't admit that's the industry standard, but he says that's what they were training on as the industry standard. If you look to Mr. Iser's testimony, our expert, he'll testify. He testified and said in 2003 PREA was passed because it was to address an epidemic known as sexual assault in prisons. Have other federal courts recognized PREA as an industry standard? Has there been either a district court or an appellate court which has said PREA is the standard that must be met? No, Your Honor. It doesn't apply. It's not mandatory to this jail. So when I say an industry standard, it's mandatory that in 2012, all federal prisons and any prison accepting federal funding, so most state prisons receive some sort of federal funding, they are required to apply PREA as the standard. If you look at the jury instructions, the jury instructions are very clear, and there are numerous times in this record that we said it is not mandatory on this jail to adopt PREA as the standard. But Mr. Iser testified to, and they were more than welcome to get an expert witness that could say what the standard should have been if it wasn't PREA, but they didn't offer any testimony to that. So the testimony in this record is Mr. Iser testifies it is not mandatory on this jail, but here is the industry standard. And I'd like to call your attention, too, to Inspector Hompf's testimony. Jail Inspector Hompf says that this was the industry standard, and he had given Captain Nargis at the Polk County Jail abundant information and said, here it is, here's the PREA standards. This is what the industry standard is. And Captain Nargis went to conferences for the Jail Administrators Association. He learned about PREA. He, in fact, says he went to the PREA Resource Center online and read about PREA. He did his own investigation. He never adopted it as a policy. Never adopted it as a policy. I'd like to go back to training. I got a little off base, and I'd like to go back to finish my training argument. The argument from counsel and the response briefs are full of trainings that they did. What you lack is not adequate training as it relates to the known risk. The known risk is sexual assault. They never trained on sexual assault. They had zero training on sexual assault until 2014 when they said, we have PREA training. Can I ask you a question on this, Mr. Weiner? How do we think about training in light of Christensen's conduct here? Knowing, deliberate, purposeful sexual assaults. It seems like he took measures to keep them hidden from others. Are we thinking about training generally as to the unit of correctional officers, or are we thinking about training as it may have impacted Christensen? As a unit of, as the former, Your Honor, as the unit of employees. Because wouldn't you agree, I mean, given the conduct that he engaged in, it's not at all clear that training would have made a bit of difference to him. I don't disagree with you, Your Honor. I don't know that there was any way to help him and train him out of it. What the record with regard to training, and I'll get to that. Let me explain it this way. Let's talk about the policy. Was it an adequate policy? The policy was so bad, there was no sexual assault policy in place in Polk County Jail until they added some language known as PREA, which gives us information that they acknowledge that that was the standard. But he cherry-picked it, and he took bits and pieces of it. And PREA itself, in order to understand PREA, you have to understand it's three phases. One is a zero tolerance. That's prevention, detection, and response. And they were very good with response, and our expert told us that. They responded very well. And the industry has responded for the last hundred years very well. But prevention requires a zero tolerance. Now, in the reply briefs, there's some mention of the magic words of zero tolerance. That's not a word. It's a culture. The culture of zero tolerance is one that a jail is to develop. That's the general basic principle of this PREA standard in saying inmates need to understand and understand they should be free from sexual assault. They don't know it. Surprisingly, they don't know that they should be free from what was occurring. Let's assume for a second that you're right, that the policies were deficient and that the training was deficient. It may not have to meet the best practices of PREA, but it fell short and they were deficient. Can you address the causation issue? Certainly. How is it that negligent or deficient policies, for purposes of the county's liability, may have caused the harm that we see here? I fear I bore you with this next comment, and the answer may be a little bit lengthy. The policy itself develops this culture of zero tolerance. It means that you inform the inmates, you educate the inmates, and that's what they should have trained on and how to do that. They should have had a policy and trained on how to do it. That includes, in some centers, there's record of PREA posters. There are videos that inmates should see on intake to say, you should be free from sexual assault. They want people to be safe in their jails and in their prisons. You should be free from sexual assault. With that information, they should understand then what's the next step. The next step is a safe reporting period. So you have prevention, detection, and response. The prevention piece is building that zero tolerance. It's making sure that when Mr. Christensen, as testified to by JKJ, when Mr. Christensen is being flirtatious inside the pod and standing next to Officers Pittman and Otteson or Mr. Schaefer's email that says, we all know what Jorgensen does, Jorgensen's just being Jorgensen, that other staff would say, that's not allowed. So based upon that response, then I trust you would agree with your adversary that the length of time here, the longevity of Christian's conduct is legally irrelevant. That's the point that was made by your adversary. I do disagree with that because the safety mechanism, the second phase of this PREA policy is detection, and that's finding some safe method to report to the outside world that says, I'm being sexually assaulted, I need help. As Mr. Iser testifies to in the record, he says, you can't tell your perpetrator or the person who's standing next to them, you can't tell the jailer, take this note. If you see there's evidence in the record that says, Mr. Christensen was reading the mail and stopped some mail from going out. They had no safe reporting period. That's the second phase of this, which is detection. And then the second phase, that detection phase, is the record such that we understand there's this concept of lockbox that exists. We don't have a lockbox at Polk County Jail, correct? That's correct. Is there any anonymous path through which sexual assault allegations can be transmitted to supervisors under what was extant at the time that these occurrences were happening? No. Not in the safe method that my clients didn't believe it was safe. My clients both testified that they did not believe it was safe to report. They didn't know who else was involved in it. They didn't know, if you think of it, they didn't know if JKJ spoke with Investigator Welch, who identified the situation and said, she first made me show a badge because she thought I was with Daryl. Because of this, we talk about tear talk. Tear talk in general is a sexualized talk or communication. There's several different phases to it. Captain Nargis was part of a minor part of it, but if you look at what Mr. Christensen did with Mr. Otteson and Mr. Pittman and what Jailor Schaffer indicates, that this happens, this talk happens, and it's demoralizing and embarrassing to the inmates. And if you look at Mr. Iser's testimony then, he says that what that ends up doing is these predators like Mr. Christensen start grooming. I'm not aware of a lockbox, secure facility method to get a note to someone to the outside. Very pointedly, my question goes to methodology versus the comfort or the possibilities for your client. Because obviously we're in the world of potential liability that would not be based just on what they thought of, but whether or not there was a methodology. Oh, the best practices. We bring up a lockbox by way of example of a simple fix, that you can't use funding to say that there wasn't a simple fix to this, there wasn't a high-price fix. What that example is, is you could have used the testimony so they can have kiosks inside the jail. In fact, if you look at the jail photos, they already have kiosks. They have kiosks, they have phones, but they have no way to know who to report to. So this isn't the best practices case. This is a policy case. Was it an obvious policy? So if you look at the Gleason-Embank decision, and I think this satisfies the dissent in that as well, that this is an obvious risk. There's an inadequate policy. There's a known solution policy, which would be a more appropriate policy that Mr. Hump has provided and Mr. Iser testified to and Mr. Nargis researched, and there was a rejection of that policy. And the harm eventually happened. And the harm that happened was the same harm that the risk eventually took place, that sexual assault happened. So that's the decision in Gleason, and I think that satisfies the dissent arguments in Gleason as well, saying this was a known and obvious risk. What harm? I don't mean there's absolutely harm here, horrific harm, but in terms of causation, what harm are we asking about? Are we asking about harm in the form of sexual assaults on female inmates by male guards? Are we asking about the conduct that Christensen engaged in and the harm that he inflicted? The former, Your Honor. That eventually took place. So the policy and training are to stop that harm. It doesn't have to be specified to Mr. Christensen in knowing that it would have stopped Mr. Christensen, but it is the eventualization of the likely harm, and I think that is the statement in Gleason indicates that or spells that out. It's a more generalized harm. I lost my train of thought, unfortunately. The policy, oh, the causation. Let me get to some of the facts that the jury could point to that are in this record. If you look at the causation element, had they had the prevention, which was knowledge and information that would have entitled or informed the inmates through posters or videos, as we had indicated, they would have known that they should be free from sexual assault. It was only after my clients were released from Polk County Jail that they found out. One of them looked at a PREA poster, zero-tolerance PREA poster, that said you should be free from sexual assault. JKJ said that was the first time she knew it. You look at that, and you can take that into consideration and say they work. That is a better policy. Had there been a better policy, this policy, in likelihood during this grooming process that they go through where they escalate the context, first it's comments about anatomy, and then it's this demoralization, and then they take advantage of him where he said he called her out and groped her, and she had nothing to do. She couldn't do anything. She froze. If you look at MJJ's testimony that said when she went to a different facility as well and she was at intake, she was informed. She watched a video and said you should be free from sexual assault, and here's what happens. If it happens, here's how to report it. If you look at her, these two are both typical sexual assault victims. They're ashamed of it. They think it's something they did. So if you look at MJJ's testimony that said, why didn't you tell somebody then when you found that out? She said, I was ashamed. I was embarrassed. My family would find out. She never went back to Polk County after that. She didn't have anybody safe to report it to. And if you look at her testimony again about the second phase of this, JKJ and MJJ both said, I didn't know it was safe to tell anybody. And that's the policy. That's what the policy should require, prevention, detection, a safe method. Whether it's a lockbox, Your Honor, or whether it's a kiosk, there needs to be a safe method. So if you look at causation, those are the two things that my clients can point to and the jury heard that said, hey, had those been in place, had this better policy not been rejected by Mr. Nargis, the policymaker, they stood a chance. They really would have stood a chance. So I think that's the biggest causation element that I can think of on the record. It's three days of testimony and trial. But I really say that the jury can clearly conclude from that, that had there been this better policy that was rejected by Captain Nargis, this harm wouldn't have occurred for that long. Let's look at the timeline, though. Mindy Juleen started being sexually assaulted in September. My apologies. MJJ was sexually assaulted in 2011, September. January 2012, the Jorgensen incident occurs, which was sexual assault, admittedly sexual assault. Captain Nargis says it and so does Sheriff Johnson. In July of 2012, Captain Nargis puts in a section to C-202, which indicates that he just puts the response section in PREA. He knows PREA is the standard. Document Exhibit 503.1 is the pre-July 2012 C-202 policy. The C-202 policy post-2012 simply states PREA. And on the last page has an indication of how to respond to PREA. Has anyone done a contrast of that post-July 2012 policy with the actual PREA? Did your expert do that or Mr. Atherton? He did verbally, Your Honor. He did verbally, or he reviewed it verbally and said it only addresses the pre- does not address prevention and detection. And he verbally explained to the jury that PREA policy is prevention, detection, and response. He indicates that this is the response section to PREA. Mr. Atherton, their expert, testifies he doesn't really know what PREA language is and he's not a PREA expert. He was really convoluted, and the jury gets to weigh that. And Mr. Iser goes into great detail saying why zero tolerance culture works for prevention, how the different methodology is available. This isn't a best practices case. This is a policy case. This is right in line with Gleason. It was completely rejected by Captain Nargis. If we might quickly touch on training, and I know I'm going to run out of time, but if we might touch on training in this as well. There was no training in sexual assault. What's been presented to you by Polk County is that the record says that there was no training. There's no testimony, no evidence in the record, and no one to say that they ever received training on sexual assault there or what it was. They said they came out of that jail certification knowing that it was a crime. That's it. There's no training. They've never had training on sexual assault. If you take the record in the light most favorable to my client, they've never had training on sexual assault at the Polk County Jail, ever. They've had training every year on suicide prevention, which is another high-risk, low-frequency situation, which is right in line with what this court's decision in Woodward was. It's an obvious risk, as is sexual assault. But they had zero training on it. None. Is that adequate to address an obvious risk? No. There's no training. What they trained on is there's this idea that they had this generalized training and that you should take this generalized training as being specific to sexual assault. It's not. It just isn't. There was no sexual assault training, period. The record is devoid of any evidence of that. If you look at this policy argument that they had a policy and they had these policies, what they're pointing to in the record is they're pointing to saying what their general jail operation policies. They talk about how to keep a safe distance from inmates, a professional distance. And they say, well, that goes to sexual assault. That doesn't remotely go to sexual assault. When we talk about what Mr. Iser talks about in his testimony, he talks about recognizing differences in an inmate's hygiene practices while they're in jail because that may be an indication that something's happening to them, that that is a sign of sexual assault. Now, they were trained to look for hygiene and the hygiene requirements. The hygiene requirements, they say, is every inmate in that prison needs to at least have some level of hygiene. That has nothing to do with it. None of the training, none of the policies that they call a framework have anything to do with this concept of sexual assault. There's just nothing. And I appreciate the Court's time and understanding in this, and this is one of those examples of a Canton exception to pattern, single incident, and is right in line with this Court's decision in Woodward and the Ambach decision in Gleason. And I think it also satisfies the dissent opinion in the Ambach decision in Gleason that this is an obvious risk and this harm that occurred was the harm that there should have been protected against. Thank you. Thank you, Mr. Widener. Mr. Cranmer, rebuttal. The first thing I want to address is the fallacy that knowing that sexual assaults can occur, that it's even obvious that sexual assaults may occur in a jail, is sufficient to meet the Canton requirement of a policy known to the county that would obviously result in sexual assault. That's the standard. They have to point to a particular policy that the county was aware of that made it obvious that sexual assaults were going to occur, not just the fact that it's obvious that sexual assaults can occur generally. That could be said of virtually anything. Falling in the shower, medical malpractice, suicide, et cetera, et cetera. That would create no standard whatsoever and essentially result in strict liability any time sexual assaults occurred. It would be obvious because it's obvious sexual assaults can occur. And I understand that's the one end of the spectrum, but that's what the Court's struggling with in Woodward and Gleason is trying to set that line where that happens. First of all, neither of those cases is a sexual assault case where the individual knows that what he's doing is illegal and he does it anyway. But secondly, both of those cases are very distinguishable. Woodward involved a situation where the individual had no training whatsoever and no experience on setting suicide precautions. And it was known, and that had been ongoing for years, that the policymakers not only knew that they were not following suicide precautions, but they encouraged it. And that led directly to the suicide that happened. No precautions, suicide occurs. That can't be said about any of the alleged policies that are identified here. In Gleason as well, there was no policy related to the coordination of care, which was ultimately what led directly to the individual's injury. Here, and I want to address finally the point that you made about this having gone on for a long time. The reason that's so important is because we're talking about a higher standard here. We're not talking about negligence or even gross negligence. This is deliberate indifference. In order to be deliberately indifferent, the policymakers at the county have to be aware of the risk and have to consciously disregard it. And if they're not aware of any sexual assault, any prior history or any of that sort of thing, how can they consciously disregard that risk, and how can that lead directly to the sexual assaults in this case? Just with regard to training, clearly there was training on sexual assault. The case law is clear. You don't need to tell. I don't want to call your attention to the light. Oh, thank you, Your Honor. Oh, I'm past. I apologize. Thank you, Your Honor. Thank you, Mr. Cranley. Thank you, Ms. Mills. Thank you, Mr. Wyman. The case will be taken under advisement.